UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOYA NICKOLE WEBSTER, | |
| Plaintiff, | Case No. 3:18-cv-00045 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Newbern |
| SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

To:     The Honorable Aleta A. Trauger, District Judge

### REPORT AND RECOMMENDATION

This case was referred to the Magistrate Judge to dispose or recommend disposition of pretrial motions under 28 U.S.C. § 636(b)(1). (Doc. No. 4.) Now pending in this Social Security appeal is Plaintiff Joya Nickole Webster's motion for judgment on the administrative record (Doc. No. 18), to which the Commissioner of Social Security has responded (Doc. No. 21). Having considered those filings and the transcript of the administrative record (Doc. No. 12), and for the reasons given below, the Magistrate Judge RECOMMENDS that Webster's motion for judgment be GRANTED IN PART, that the decision of the administrative law judge be REVERSED IN PART, and that the case be REMANDED for further administrative proceedings consistent with this opinion.

### I.     Background

Webster, who is now 48 years old, suffers from multiple ailments. Chief among them, and most salient to this appeal, are impairments to her left shoulder, left hand, back, and right knee. After two surgeries on her left shoulder and repeated attempts to rehabilitate it, Webster still suffers

from shoulder tendinitis and pain that increases with movement.[1] That pain is exacerbated by cervical radiculopathy, known colloquially as a pinched nerve, and cervical spine degenerative disc disease, which causes pain to radiate from Webster's neck into her shoulders and, occasionally, her fingers. Webster's left ring finger has caused her additional pain since it was caught in a door and fractured. Webster also experiences lower back problems, which worsened after a fall. In her right knee, Webster has developed osteoarthritis and chondromalacia, which is inflammation caused by deterioration of the cartilage beneath the kneecap.[2] Two car accidents have exacerbated Webster's conditions. She uses a cane to walk.

Webster also experiences several other chronic illnesses, including diabetes, obesity, anxiety, and asthma. At the time of her application for benefits, Webster was five feet, three inches tall and weighed 225 pounds. (Tr. 197.) Her doctors have repeatedly described her diabetes as poorly controlled, and Webster takes medications for recurring anxiety and asthma attacks. Webster is a high school graduate who received some vocational training in cosmetology and data entry. She has worked at a call center, in collections, and most recently, as a baby sitter. (Tr. 198.)

On September 3, 2014, at 44 years old, Webster filed an application for disability insurance benefits (DIB) under Title II of the Social Security Act and a Title XVI application for

---

[1] Shoulder tendinitis is an "inflammation injury" to the tendons of the shoulder's rotator cuff. *Shoulder Tendonitis*, PhysioWorks, https://physioworks.com.au/injuries-conditions-1/rotator-cuff-tendonitis (last visited Feb. 19, 2019).

[2] *Chondromalacia*, HealthLine, https://www.healthline.com/health/chondromalacia-patella (last visited Feb. 19, 2019).

2

supplemental security income (SSI), alleging that she has been disabled since June 10, 2007, which is when she stopped working.[3] (Tr. 181, 197.)

After Webster's claims were denied on initial review and again on reconsideration (Tr. 67, 78, 92, 99), she requested a hearing before an administrative law judge (ALJ) (Tr. 124). That hearing took place on September 21, 2016, in Nashville, where Webster appeared with counsel and testified. (Tr. 10, 40, 124, 138–39.) A vocational expert (VE) also testified. (Tr. 53.) On December 2, 2016, the ALJ determined that Webster was not disabled at the fifth step of the relevant analysis, finding that, although Webster could no longer perform any of her prior jobs, she had the residual functional capacity[4] (RFC) to do certain low-skilled sedentary jobs that exist in sufficient numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); (Tr. 19). On November 16, 2017, the Appeals Council denied Webster's request for review of the ALJ's decision, rendering that decision final. (Tr. 1, 169.)

Webster timely filed this civil action on January 15, 2018, seeking review of the ALJ's decision to deny her DIB and SSI. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); (Doc. No.1). She raises four arguments, all of which concern the ALJ's construction of her RFC. First, she contends that the ALJ did not provide good reasons for declining to adopt the December 22, 2015 medical opinion of her primary care physician, Dr. James Sullivan. (Doc. No. 18-1, PageID# 1714–16.) Second, and relatedly, she argues that the ALJ improperly relied on the medical opinions of

---

[3]     Although Webster alleged a disability onset date of December 31, 2008 in her Title II application and a date of June 10, 2007 in her Title XVI application, the ALJ used the latter date in reviewing both applications. (Tr. 10, 179, 181.)

[4]     "An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations." SSR 16-3P, 2016 WL 1119029, at *11 (Mar. 16, 2016).

3

consulting physicians who never examined her. (*Id.* at PageID# 1713–14.) Third, she argues that the ALJ made several other miscellaneous errors in analyzing her RFC. (*Id.* at PageID# 1721–22.) Finally, she argues that the ALJ failed to properly analyze her credibility. (*Id.* at PageID# 1717–21.)

## A. Relevant Medical History

According to Webster, her pertinent medical history begins towards the end of October 2012. (*Id.* at PageID# 1707.) From that point through August 2016, Webster repeatedly sought medical attention due to pain in her shoulders, back, right knee, and fingers. She also sought treatment for anxiety and various other medical issues. The summary below provides an overview of the relevant treatment that Webster received for her conditions.

### 1. Webster's Left Shoulder

Webster's shoulder problems began in December of 2012, when she reported pain in her left shoulder. Dr. Vincent Morelli at Nashville General Hospital (NGH) performed an arthrogram and an MRI on that shoulder on December 18, 2012. Both revealed the onset of calcific tendinitis, a disorder in which calcium phosphate deposits accumulate in tendons, most commonly those of the shoulder, causing pain and inflammation.[5] (Tr. 870, 891.)

That pain continued over the course of the following months, prompting another hospital visit on April 3, 2013, when Webster saw Dr. Ronald Baker, also at NGH. Webster told Dr. Baker that the pain in her left shoulder often radiated down to her elbow at night and that she was having trouble sleeping. She experienced pain during Dr. Baker's range of motion examination. Because

---

[5]     *Calcific tendinitis*, Wikipedia, https://en.wikipedia.org/wiki/Calcific_tendinitis (last visited Feb. 19, 2019).

Webster expressed no interest in surgery, Dr. Baker proceeded with a conservative treatment regimen consisting of steroid injections and physical therapy. (Tr. 413.)

Webster was evaluated for a course of physical therapy on April 8, 2013. As part of the evaluation, Webster reported that the pain in her left shoulder was a five out of ten at rest and a ten out of ten when grooming and dressing. (Tr. 929.) The physical therapist concluded that Webster needed help dressing 25% of the time and that she needed help with grooming and housecleaning 50% of the time. (Tr. 930–31.) The therapist labeled Webster's condition severe, meaning that it "interrupts [her] ability to work, eat, sleep, and participate in daily life." (Tr. 931.) The evaluation concluded with a prescribed course of physical therapy: Webster would have sessions twice a week for four weeks. (Tr. 932.) Webster's goal was to reduce pain for uninterrupted sleep and to increase her range of motion to facilitate daily living. (*Id.*)

On April 29, 2014, Webster presented at NGH to establish a relationship with a primary care physician, Dr. Sullivan, and the resident he was supervising, Dr. Sonya Reid-Lawrence. (Tr. 398–99.) Dr. Reid-Lawrence's notes from the appointment reflect that, in addition to suffering from diabetes, recurrent abscesses, chronic heart failure, and osteoarthritis, Webster had tendinitis in both shoulders and exhibited a decreased range of motion. (*Id.*) As discussed below, Dr. Sullivan and Dr. Reid-Lawrence provided medical opinions as to Webster's RFC in December 2015 and March 2016 respectively.

By July 28, 2014, Webster concluded that the physical therapy had not helped her shoulder. After receiving a referral (Tr. 421) back to Dr. Baker from Dr. Sullivan, Webster asked to pursue additional treatment. (Tr. 590.) She reported that her pain was worst at night and when attempting to raise her left arm above shoulder level. (*Id.*) Dr. Baker noted that Webster's range of motion was diminished in her left shoulder and that she had positive Neer and Hawkins impingement

signs.[6] (*Id.*) Dr. Baker concluded by stating that he would "plan for surgical intervention in the near future." (*Id.*)

On September 5, 2014, Webster continued to complain of pain in her left shoulder and stated that she would like to proceed with surgery. (Tr. 1002.) Dr. Baker declared that Webster had "failed conservative [treatment]," and scheduled an arthroscopic bursectomy and acromioplasty for September 9, 2014. (Tr. 1002, Tr. 589.) That procedure aims to reduce shoulder inflammation by removing a small portion of the acromion, which is a bone that extends over the shoulder joint, and a bursa, which is a fluid-filled sac that cushions neighboring bone structures.[7] (Tr. 918.) Dr. Baker performed the procedure on September 9, 2014, without complications. (Tr. 917–18.) At Webster's post-operation appointment on September 22, 2014, Dr. Baker noted that Webster was doing well overall, although pain limited her range of motion and palpation of the shoulder caused tenderness. (Tr. 422.) Dr. Baker prescribed another course of physical therapy and an anti-inflammatory drug. (*Id.*)

Over the next several months, the condition of Webster's left shoulder steadily declined. On February 24, 2015, Webster returned to the hospital complaining of pain. (Tr. 967.) Dr. Reid-Lawrence noted that Webster's pain had worsened over the past month and instructed Webster to continue taking her medications and return for a follow-up appointment in three months. (Tr. 968.)

---

[6]     "The Neer Impingement Test is a test designed to reproduce symptoms of rotator cuff impingement through flexing the shoulder and pressure application." *Neer Impingement Test*, Wikipedia, https://en.wikipedia.org/wiki/Neer_Impingement_Test (last visited Feb. 19, 2019). The Hawkins-Kennedy Test is similar, but a positive test indicates damage to the tendon of the supraspinatus muscle specifically. *Hawkins-Kennedy test*, Wikipedia, https://en.wikipedia.org/wiki/Hawkins%E2%80%93Kennedy_test (last visited Feb. 19, 2019).

[7]     *Acromioplasty*, Wikipedia, https://en.wikipedia.org/wiki/Acromioplasty (last visited Feb. 19, 2019); *Bursectomy*, Wikipedia, https://en.wikipedia.org/wiki/Bursectomy (last visited Feb. 19, 2019).

6

On March 18, 2015, Webster saw Dr. Baker and informed him that, despite having done well with physical therapy initially, she had stopped making progress, and the pain in her left shoulder had begun radiating into her hand.[8] (Tr. 1342.) Dr. Baker's examination revealed a decreased range of motion in Webster's shoulder and decreased grip strength in her left hand. (*Id.*) He gave Webster a steroid injection, told her to return to physical therapy, and stated that they would take an MRI of the shoulder if pain persisted in two months. (*Id.*) Webster sought emergency room treatment on April 12, 2015, complaining of a constant sharp and throbbing pain in her left shoulder. (Tr. 1318.) She stated that her pain had increased after her most recent injection and that she was out of pain medication. (*Id.*) The ER doctor refilled Webster's prescriptions and discharged her. (Tr. 1320.) Webster returned to Dr. Baker for a follow-up examination on May 18, 2015, during which Dr. Baker noted that Webster continued to have pain in the same areas of the shoulder and that that pain increased with cervical range of motion exercises. (Tr. 1297.) Dr. Baker hypothesized that Webster's shoulder pain might be related to cervical radiculopathy. (*Id.*)

In June 2015, Webster again sought surgical intervention. Dr. Baker diagnosed Webster with "frozen shoulder and persistent pain" on June 11, 2015 and planned a surgery for July 14, 2015. (Tr. 1278.) On that day, Webster was evaluated before the operation by an anesthesiologist who determined that, given Webster's heightened white blood cell count and recent dental abscess, the surgery had to be cancelled. (Tr. 1269.) Dr. Baker concluded that Webster could return for surgery after being cleared by Dr. Sullivan. (*Id.*)

Webster was unable to reschedule the shoulder surgery quickly. In August 2015, Webster slammed her left hand in a door, fracturing her ring finger. (Tr. 1248.) When she saw Dr. Baker

---

[8] Webster appeared for a physical therapy evaluation on September 24, 2014, but never returned for follow-up appointments. (Tr. 1061, 1066.)

on September 2, 2015, she informed him that she recently had six screws put in that finger and therefore wanted "to let [it] heal before proceeding with any type of treatment for her shoulder." (Tr. 1092, 1095.) Webster was instructed to make an appointment when her hand had improved. (Tr. 1095.) Then, on October 11, 2015, Webster was rear-ended in a car accident, further complicating her recovery. When Webster saw Dr. Baker for a follow-up appointment three days later, her left arm was in a sling and she rated her left shoulder pain a ten out of ten. (Tr. 1224.) Webster stated that she had been unable to use her arm since the accident. (*Id.*) She also complained of pain and numbness in her left ring and pinky fingers. (*Id.*) Dr. Baker diagnosed her with a left shoulder contusion and cervical strain and prescribed physical therapy and continuation of her medication regimen. (Tr. 1227.)

Webster turned again to options for non-surgical treatment of her shoulder. Beginning on October 29, 2015, she commenced another four-week round of physical therapy. (Tr. 1214–18.) When therapy ended on December 17, 2015, Webster still had significant pain in her left shoulder, although it had decreased somewhat. (Tr. 1218.) By then, Webster had also begun experiencing discomfort in her right shoulder.[9] At a November 24, 2015 appointment with Dr. Baker, Webster stated that, since the accident, she had experienced neck and bilateral shoulder pain that radiated into her fingers. (Tr. 1195.) Range of motion exercises confirmed that pain. (Tr. 1198.) Dr. Baker ordered an MRI of the neck and cervical spine and prescribed additional physical therapy. (*Id.*)

On January 26, 2016, Webster saw Dr. Reid-Lawrence for a routine follow-up and complained of worsening left shoulder pain that had been limiting her daily activities. Webster

---

[9]     Webster reported sharp pain in her right shoulder as early as March 17, 2014, but that seems to have been related to an abscess on her right chest wall that was surgically removed. (Tr. 561, 916.)

reported that the pain was "6/10, constant, worse with movement and partially relieved by [L]ortab." (Tr. 1168.) Dr. Sullivan ordered an MRI of the left shoulder, which took place on February 10, 2016. (Tr. 1166.) The MRI revealed a "[n]ear complete tear of the distal supraspinatus tendon" and "[m]ild osteoarthritis of the acromioclavicular joint with effacement of the underlying fat."[10] (*Id.*) When Webster saw Dr. Baker on March 7, 2016, her left shoulder pain had jumped to a ten out of ten, and Dr. Baker noted that left drop arm was present.[11] (Tr. 1159.) Webster was scheduled for another shoulder surgery to repair the torn tendon and reduce inflammation. (Tr. 1160.)

That surgery took place on March 15, 2016, without complications. (Tr. 1147.) Dr. Baker began the procedure with an arthroscopic examination, which revealed that the supraspinatus tendon was intact, but that the labrum, which is a rubbery cartilage that surrounds the shoulder socket and steadies the ball of the joint, had been torn.[12] (Tr. 1148.) The exam also revealed a bone growth on the acromion. (*Id.*) Dr. Baker removed the labral flap and the bone growth and finished with a subacromial bursectomy. (*Id.*)

Webster's post-surgery trajectory was again characterized by temporary improvement and then decline. On March 30, 2016, Dr. Baker noted that Webster had minimal pain in her shoulder

---

[10]     The supraspinatus tendon is part of the rotator cuff of the shoulder. *Supraspinatus tear*, Physiopedia, https://www.physio-pedia.com/Supraspinatus_tear (last visited Feb. 19, 2019).

[11]     A patient is positive for drop arm if, when her shoulder is lifted to 90 degrees, she is unable to lower the arm of the affected shoulder slowly and smoothly to her side. The drop arm test is used to determine whether a patient has a torn supraspinatus tendon.  *Drop arm test*, the Free Dictionary, https://medical-dictionary.thefreedictionary.com/drop+arm+test (last visited Feb. 19, 2019).

[12]     *Orthopaedic          Surgery*,          Johns          Hopkins          Medicine, https://www.hopkinsmedicine.org/orthopaedic-surgery/specialty-areas/sports-medicine/conditions-we-treat/labral-tear-shoulder.html (last visited Feb. 19, 2019).

post-surgery and prescribed physical therapy. (Tr. 1614.) Webster appears to have started therapy on April 7, 2016, but never returned for follow-up treatment. (Tr. 1643–44.) In June 2016, Webster started treatment with Dr. Alicia Jackson at Regents Medical Center (Regents) because Dr. Sullivan had retired.[13] (Tr. 1439.) Webster also complained that her shoulder had not improved after two surgeries and repeated efforts at physical therapy and that she no longer wanted to see Dr. Baker.[14] (*Id*.) In physical examinations on June 6, 2016, and August 11, 2016, Webster reported pain in her left shoulder and in her right shoulder during range of motion exercises. (Tr. 1435–36, 1647–48.) After Webster asked Dr. Jackson for a follow-up MRI of her left shoulder, Dr. Jackson referred Webster to Dr. Jason Haslam. (Tr. 1439, 1451.)

Dr. Haslam obtained an MRI of Webster's left shoulder on July 8, 2016. (Tr. 1453.) The MRI revealed no partial or full-thickness rotator cuff tear, but Dr. Haslam did find mild tendinitis and blunting of the anterior labrum, "possibly secondary to previous debridement or chronic degeneration." (Tr. 1458.) Webster received steroidal injections on July 14, 2016, and July 29, 2016. (Tr. 1455, 1458.) Dr. Haslam's notes from July 29, 2016 are the last substantive treatment record relevant to Webster's shoulders in the record. On that day, he noted that Webster's pain was rated a nine out of ten, that overhead motion aggravated her discomfort, and that previous injections and physical therapy had not provided her any significant relief. (Tr. 1453.)

---

[13]     A May 24, 2016 record mentions that Webster was aware that Dr. Sullivan's clinic was closing and that Webster had made an appointment for a new primary care physician in another clinic. (Tr. 1603.)

[14]     The medical notes associated with this visit show that Webster claimed that she had seen Dr. Matthews for both of her shoulder surgeries. (Tr. 1439.) Dr. Baker was the surgeon in both cases. As discussed below, Dr. Matthews was the spine specialist to whom Dr. Baker referred Webster. (Tr. 1077.)

### 2.    Webster's Back

In the July 28, 2014 physical examination of Webster's left shoulder, Dr. Baker also found that Webster had paracervical and periscapular tenderness and diagnosed her with mild cervical radiculitis.[15] (Tr. 420.) Dr. Baker prescribed physical therapy for the cervical spine and also a non-steroidal anti-inflammatory drug. (*Id.*) When Dr. Baker saw Webster for a follow-up appointment on May 18, 2015, he found that cervical range of motion exercises caused Webster increased discomfort and ordered an electromyography (EMG) study to determine whether Webster was suffering from cervical radiculopathy. (Tr. 1297.) That study came back negative. (Tr. 1278.)

But Webster's condition changed after the October 11, 2015 car accident. In a November 24, 2015 follow-up appointment, Dr. Baker observed a further decrease in Webster's cervical range of motion and noted a positive bilateral Spurling's test, which is a maneuver used to measure nerve root pain. [16] (Tr. 1198.) Webster described pain radiating from her neck and both shoulders into her fingertips. (Tr. 1195.) Dr. Baker ordered an MRI of the cervical spine, which took place on December 10, 2015. (Tr. 1080). Reviewing the MRI, Dr. Baker found a "straightening of the normal cervical lordotic curvature" and "[m]ultilevel disc dehydration." (Tr. 1080.) Dr. Baker referred Webster to neurosurgeon Dr. Douglas Matthews (Tr. 1198), who reviewed the MRI on January 18, 2016 and found a small foraminal disc bulge at C5-C6 on the left (Tr. 1077). He

---

[15]    Radiculitis is "pain that radiates along the nerve caused by inflammation at the root of its connection to the spinal column." *What is Radiculitis?*, Atlantic Spine Center, http://www.atlanticspinecenter.com/conditions/radiculitis/ (last visited Feb. 19, 2019). Radiculitis is a form of radiculopathy that refers specifically to inflammation of a spinal nerve root, rather than, for instance, compression of it. *Radiculopathy, Radiculitis, Radicular—Clarifying the Differences*, Very Well Health, https://www.verywellhealth.com/what-is-radiculopathy-radiculitis-radicular-pain-4164339 (last visited Feb. 19, 2019).

[16]    *Spurling's test*, Wikipedia, https://en.wikipedia.org/wiki/Spurling%27s_test (last visited Feb. 19, 2019).

diagnosed Webster with cervicalgia, cervical disc degeneration, cervical radiculopathy, noted her high body mass index, and prescribed her the same non-steroidal anti-inflammatory drug.[17] (Tr. 1077.)

Webster has also suffered from chronic lower back pain. In a December 23, 2014 appointment with Dr. Reid-Lawrence, Webster complained of back pain in addition to shoulder pain. (Tr. 965.) In a follow-up appointment on February 24, 2015, Webster was still complaining of "chronic low back pain," which had worsened since she fell one month prior. (Tr. 967.) Dr. Reid-Lawrence noted paravertebral spine tenderness in Webster's lumbar area and ordered an X-ray of the lumbar spine and a refill of Webster's Lortab prescription.[18] (Tr. 968.) Webster continued to complain of lower back pain in medical appointments over the course of the next two years. In March 2015, Webster was still receiving Lortab for shoulder and back pain. (Tr. 1331.) Webster also complained of lower back pain during physical examinations at Regents between June and August 2016. (Tr. 1435, 1438, 1447, 1647.)

### 3. Webster's Right Knee

After Webster complained of right knee pain, Dr. Sabrina Finney of NGH ordered an X-ray of the knee on October 22, 2012, which revealed osteoarthritis but no evidence of fracture or

---

[17]     Cervicalgia is "back pain that occurs toward the rear or the side of the cervical (upper) spinal vertebrae. It generally is felt as discomfort or a sharp pain in the neck, upper back or shoulders." *Cervicalgia—overview of causes, symptoms and treatments*, Laser Spine Institute, https://www.laserspineinstitute.com/back_problems/neck_pain/overview/cervicalgia/ (last visited Feb. 19, 2019).

[18]     The lumbar spine is the portion of the spinal column that extends from the lower thoracic spine to the sacrum. *Lumbar Spine Definition*, Spine-Health, https://www.spine-health.com/glossary/lumbar-spine (last visited Feb. 19, 2019). Lortab is a prescription painkiller that is comprised of hydrocodone, an opiate, and acetaminophen. *Lortab*, Addiction.com, https://www.addiction.com/a-z/lortab/ (last visited Feb. 19, 2019).

12

other acute osseous lesion. (Tr. 887.) A December 13, 2012 MRI of Webster's knee confirmed the absence of a fracture and showed all tendons intact. (Tr. 890.) Although Dr. Reid-Lawrence noted Webster's osteoarthritis in April 2014, little appears in the record regarding Webster's knee until 2016. (Tr. 398.)

Webster's knee pain flared after she was involved in a car accident that occurred in early 2016. In a March 30, 2016 appointment with Dr. Baker, Webster complained of knee pain that she rated a five out of ten and stated that "her right knee struck the dash during the [motor vehicle collision] that occurred several weeks ago." (Tr. 1610, 1613.) She was using a cane prescribed by Dr. Crystal Bowman on March 7, 2016.[19] (Tr. 1161) and described "being unable to fully extend her knee and experiencing clicking and intermittent locking of the knee" (Tr. 1610). Dr. Baker diagnosed Webster with a right knee contusion and right knee internal derangement with a possible Meniscal tear; prescribed physical therapy for the knee; and planned to obtain an MRI of the knee in four weeks if its condition did not improve. (Tr. 1614.)

Although Webster appeared for a physical therapy intake on April 7, 2016, she never returned for follow-up sessions. (Tr. 1643, 1644.) The notes from the intake mention that an MRI of the knee was scheduled for May 2, 2016. (Tr. 1639.) Dr. Baker's evaluation of that MRI, which appears to have been his last act as one of Webster's treating physicians, noted small joint effusion, no ligament or tendon tear, and mild fissuring of the patellar cartilage suggestive of chondromalacia patella.[20] (Tr. 1638.)

---

[19]     An X-ray taken of the knee on that day mirrored the one from 2012, showing osteoarthritis but no evidence of fracture. (Tr. 1162.)

[20]     Knee effusion, commonly caused by arthritis, is a swelling that results "when excess fluid accumulates in or around the knee joint." *What is water on the knee?*, MedicalNewsToday, https://www.medicalnewstoday.com/articles/187908.php (last visited Feb. 19, 2019). Chondromalacia patella is "inflammation of the underside of the patella and softening of the

Nurse Practitioner Stephen Johnson, who worked with Dr. Haslam, confirmed the diagnosis of chondromalacia after reviewing an additional MRI taken on June 28, 2016. (Tr. 1458, 1461.) On July 14, 2016, Johnson noted that Webster had a normal gait but that she experienced pain in range of motion exercises. (Tr. 1457–58.) He provided Webster with a steroid shot to the knee and a brace and encouraged her to exercise as tolerated. (Tr. 1458.) When Webster returned for a follow-up appointment on July 29, 2016, she reported that, although the knee brace had provided temporary relief, her pain was an eight out of ten and aggravated by bearing weight. (Tr. 1453.) After noting that Webster again had a normal gait but limited range of motion, Dr. Haslam gave Webster another injection. (Tr. 1454.) Dr. Haslam's treatment notes from this session do not mention exercise and instead refer to the prospect of repeat injections. (*Id.*) In physical examinations at Regents on June 6, 2016 and August 11, 2016, Webster was noted as having pain and limited range of motion in her right knee and walking with a slowed gait with the assistance of a cane. (Tr. 1434–36, 1647–48.)

### 4. Webster's Left Hand

Webster first mentioned discomfort in her left hand in connection with her shoulder pain. On March 18, 2015, Dr. Baker noted that the range of motion in Webster's left shoulder had decreased and that the pain there was radiating into her hand. (Tr. 1342.) At a May 18, 2015 follow-up appointment, Dr. Baker repeated his prior findings and documented decreased grip strength as well as wrist extension on the left side. (Tr. 1297.) On June 8, 2015, Webster indicated that her hand pain had started about six months after her first shoulder operation, that she "ha[d] pain along the left arm with certain movements of her shoulder," and that "she can have radiating pain to her

cartilage." *Chondromalacia patellae*, Wikipedia, https://en.wikipedia.org/wiki/Chondromalacia_patellae (last visited Feb. 19, 2019).

thumb and her 5th digit on occasion." (Tr. 1280.) Dr. Aaron Yang, who was being supervised by Dr. Baker, speculated that Webster's pain might be the result of cervical radiculitis. (*Id.*)

Things got worse for Webster's left hand when she slammed it in a door on August 3, 2015. (Tr. 1248.) Webster received treatment at Skyline Medical Center after the accident, where she was diagnosed with a fracture. (*Id.*) Dr. Baker confirmed that diagnosis in an assessment of the finger on August 10, 2015, and referred Webster to a hand specialist for surgery. (Tr. 1251–52.) The surgery took place without complications on August 19, 2015. (Tr. 1369.) Fracture fragments were elevated, fibrous tissue was removed, and a plate and screws were embedded to keep the repair in place. (*Id.*)

Although Webster experienced some pain after the surgery, her finger was healing as expected. At a post-op appointment on August 24, 2015, Webster received instruction regarding home physical therapy exercises and elevation of her injured hand. (Tr. 1365–67.) Three days later, Webster's wounds were noted as being "well-healed" and an X-ray showed "good alignment of the fracture." (Tr. 1364.) A follow-up exam on September 15, 2015 revealed that, although "[r]egional soft tissues remain[ed] quite swollen," Webster's finger continued to heal "in anatomic alignment." (Tr. 1362.)

The October 11, 2015 car accident disrupted Webster's healing. On October 14, 2015, Webster presented at NGH with pain and decreased range of motion in her left ring finger. (Tr. 1088.) She was also experiencing numbness in both that finger and her left pinky finger. (*Id.*) Dr. Baker ordered an X-ray, which showed "[n]o evidence of reinjury or other acute osseous abnormality." (Tr. 1229.) Webster was still experiencing discomfort on November 24, 2015, when she reported that pain was traveling from her neck down both shoulders and into her fingertips. (Tr. 1195.) As discussed above, Webster was ultimately diagnosed with cervicalgia, cervical disc

15

degeneration, and cervical radiculopathy. (Tr. 1077.) In examinations at Regents on June 6, 2016 and June 20, 2016, Webster showed weakness in both her left arm and hand. (Tr. 1439–40, 1447.) However, an August 11, 2016 exam did not mention any such weakness and noted a normal range of motion in Webster's left elbow and wrist. (Tr. 1648.)

### 5.    Other Medical Problems

Webster has dealt with a host of other medical issues. She has undergone operations on her gallbladder (Tr. 423, 902), urethra (Tr. 583, 900), and ankle (Tr. 515), and has had multiple abscesses removed (Tr. 427, 435, 610, 629, 638). Webster's doctors have regularly referred to her diabetes as "poorly controlled," and she has been diagnosed with chronic hypertension, obesity, congestive heart failure, renal failure, gastroesophageal reflux disease, and asthma. (Tr. 423, 427, 438, 610–11, 614, 978, 1305, 1345, 1563, 1592.) She has also struggled with anxiety and depression, for which she has been prescribed Vistaril, Buspirone, Xanax, Prozac, Sertraline, and psychotherapy. (Tr. 937, 1101, 1104, 1116, 1120.) Although Webster claims that Adderall relieves her depression, it does not appear that she was ever formally diagnosed with ADHD or prescribed the drug, and a doctor informed Webster in September 2016 that Adderall is not used to treat depression.[21] (Tr. 1657.) Webster's mental health was worst during the several months—roughly, October 2014 through January 2015—when she was hosting her seventeen-year-old cousin and her cousin's one-month-old infant. (Tr. 1106, 1113, 1117, 1120, 1124.) In an April 28, 2016 psychological screening of Webster for bariatric surgery,[22] Webster was noted as having mild

---

[21]    Notes from Webster's exams at Regents on June 6 and August 11, 2016 mention that Webster was suffering from ADHD and "unspecified" bi-polar disorder. (Tr. 1435, 1648.) Webster does not appear to have received medication from Regents for either of those alleged conditions. (Tr. 1437, 1649.)

[22]    "Gastric bypass and other weight-loss surgeries make changes to your digestive system to help you lose weight by limiting how much you can eat or by reducing the absorption of nutrients,

16

depression and anxiety, and Adjustment Disorder with mixed emotional features.[23] (Tr. 1431.) Webster underwent bariatric surgery on September 8, 2016. (Tr. 40.)

### B.     Consulting Physicians' Opinions

Denial of Webster's application for disability and SSI benefits on initial review was based on the January 13, 2015 opinion of Dr. Thomas Thrush. (Tr. 67, 78.) Thrush, a consulting physician for the Social Security Administration who had never treated or examined Webster, noted that she had severe diabetes, hypertension, asthma, joint dysfunction, and anxiety (Tr. 71), and opined that the medical evidence in her file supported the following work-related limitations: occasional lifting and/or carrying of up to twenty pounds; frequent lifting and/or carrying of up to ten pounds; standing or walking (with normal breaks) for a total of about six hours in an eight-hour workday; sitting (with normal breaks) for about six hours in an eight-hour workday; limited left overhead reaching, but unlimited handling, fingering, feeling, pushing, and pulling; and avoidance of concentrated exposure to respiratory irritants. (Tr. 73–75.) Thrush concluded that Webster had the ability perform light work[24] and was therefore not disabled. After Webster requested

---

or both." *Bariatric Surgery*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/bariatric-surgery/about/pac-20394258 (last visited Feb. 19, 2019).

[23]     Symptoms associated with this diagnosis include "a mix of depression and anxiety as well as behavioral problems." *Adjustment Disorders*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/adjustment-disorders/diagnosis-treatment/drc-20355230 (last visited Feb. 19, 2019).

[24]     As discussed below, light work includes "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

reconsideration of the initial denial, Dr. Kevin Whittle provided an April 1, 2015 opinion echoing Thrush's conclusion and adopting the same work-related limitations.[25] (Tr. 89–92.)

### C.    Treating Physicians' Opinions

In a September 3, 2015 medical source statement, Dr. Sullivan stated that Webster suffered from congestive heart failure, a finger fracture, and frozen shoulder. (Tr. 1067.) He concluded that Webster could not reasonably be expected to maintain a forty-hour work week given her impairments, which included an inability to deal with work stress or timely complete tasks. (Tr. 1067–69.) He noted that surgery on Webster's "hand and major shoulder" was anticipated and that he would need to reevaluate her status after the surgery. (Tr. 1070.)

He did so in a December 22, 2015 physical RFC questionnaire in which he stated that he had been treating Webster every three months for two years and that she suffered from diabetes, frozen shoulder, severe cervical radiculopathy, chronic lower back pain, depression, and anxiety. (Tr. 1071, 1075.) He noted that Webster had pain on the right side of her neck, in her right shoulder, and in her left shoulder and arm, which she could not lift above her waist. (Tr. 1071.) He also added that Webster had a weak grip. (*Id.*) Dr. Sullivan provided the following list of work-related limitations:

- No standing or sitting for more than thirty minutes at a time;

- Limit standing/walking to less than two hours in a workday;

- Limit sitting to about four hours in a workday;

---

[25]    Whittle provided that opinion to support the SSA's reconsideration of Webster's application for SSI benefits. As discussed in more detail below, Dr. Jerry Buchkoski's opinion—provided to support reconsideration of Webster's application for *disability benefits*—did not mention any work-related limitations because Webster provided insufficient evidence of the existence of a disability prior to her last insured date of December 31, 2008, which was, by itself, enough to deny that application. (Tr. 99.)

18

- Walk around for ten minutes roughly every twenty minutes;

- Lift less than ten pounds occasionally, ten pounds rarely, and never lift twenty pounds or more;

- Look down, turn the head, and hold the head in a static position occasionally, and never look up;

- Twist occasionally, bend or crouch rarely, and never climb ladders or stairs;

- Use the right hand for manipulation of objects and right arm for reaching about four hours in a workday; and

- Do not use the left hand for manipulation of objects or the left arm for reaching.

(Tr. 1073–75.) Dr. Sullivan also estimated that Webster would likely be absent from work about four days per month due to her impairments. (Tr. 1075.) On March 29, 2016, Dr. Reid-Lawrence added her signature to Sullivan's responses to the questionnaire. (Tr. 1428.)

### D. Administrative Hearing and the ALJ's Decision

At the September 21, 2016 hearing, Webster testified regarding the state of her physical limitations. She explained that, although she does not have issues with her right hand, her frozen left shoulder and broken left ring finger have rendered her left hand useless. Webster is unable to brush her hair or hold a cell phone with her left hand and she needs help dressing and bathing (Tr. 43–44.) Due to pain in her right knee, Webster uses a cane to transition between sitting and standing and to stabilize her as she walks. (Tr. 45.) She explained that, every fifteen minutes, she alternates between sitting and standing and is only able to walk for about five minutes at a time. (Tr. 46.) She had to stand up during the hearing. (Tr. 49.) She has not driven since the October 11, 2015 car accident. (Tr. 53.)

19

Webster also testified regarding her employment history. She explained that she held her last full-time job in 2002, when she worked in collections for Ford Motor Credit. (Tr. 48.) After being hospitalized and diagnosed with diabetes, she was placed on medical leave and did not return to that job. (Tr. 49.) Webster held part-time jobs between 2002 and 2007, but she was unable to work effectively and was let go from each position. (*Id.*)

After Webster's testimony, the ALJ questioned a vocational expert (VE) to determine whether Webster, given certain hypothetical work-related limitations, might be able to find employment. In the first hypothetical (which mirrors the RFC that the ALJ ultimately adopted), the ALJ asked the VE to imagine an individual with Webster's age, education, and past work experience, who could: (1) with her right arm, occasionally lift and carry twenty pounds and frequently carry ten pounds; (2) carry less than ten pounds with the left arm; (3) sit for six of eight working hours; (4) stand and/or walk six of eight working hours; (5) occasionally reach overhead with the left arm; (6) occasionally handle and finger with the left hand; and (7) not tolerate concentrated exposure to respiratory irritants. (Tr. 55–56.) In response to the ALJ's questions, the VE explained that such an individual could not perform any of Webster's prior jobs, but could work as a surveillance system monitor, a telephone quotation clerk, or a finisher. (Tr. 56–57.) The VE also stated that those jobs would not be available if the hypothetical individual required two additional fifteen-minute breaks each work day or was completely unable to push and pull with the left arm. (Tr. 58–59)

In the second hypothetical, which appears to have been based on the RFC adopted by Doctors Sullivan and Reid-Lawrence, the ALJ posited an individual who could: (1) occasionally lift and carry less than ten pounds; (2) sit four of eight working hours; (3) stand less than two of eight working hours; (4) walk less than two of eight working hours for thirty minutes at a time; (5)

20

never look up; (6) never climb ladders, ropes, or scaffolds and who would be absent four or more days each month. (Tr. 58.) The VE stated that such an individual would not be able to find employment. (*Id.*)

In a December 2, 2016 decision, the ALJ applied the relevant five-step analysis and denied Webster benefits at the final step. At the first step, the ALJ found that Webster had not engaged in substantially gainful employment since June 10, 2007, the alleged onset date of her disability. (Tr. 12.) At the second, the ALJ concluded that Webster had the following severe impairments: anxiety disorder, obesity, asthma, major joint dysfunction-frozen left shoulder, osteoarthritis of the right knee, cervical spine degenerative disc disease, and diabetes. (*Id.*) At the third, the ALJ found that those impairments, considered individually or in combination, did not amount to a condition that meets one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13.) Between steps three and four, the ALJ determined that Webster had the RFC to lift/carry twenty pounds with the right dominant upper extremity and less than ten pounds with the left upper extremity; sit six of eight hours; stand/walk six of eight hours; occasionally reach overhead with her left non-dominant extremity; occasionally handle/finger with her left non-dominant upper extremity; and occasionally push/pull with the left non-dominant upper extremity. (Tr. 14.) The ALJ also noted that Webster could not tolerate concentrated exposure to respiratory irritants. (*Id.*) With those limitations, the ALJ found that Webster had the RFC to perform light work. (*Id.*) At the fourth step, the ALJ concluded that Webster could not continue her prior work as a collections clerk. (Tr. 19.) At the fifth, the ALJ found, based on the testimony of the VE, that Webster could work as a surveillance systems monitor, telephone quotation clerk, or finisher, and that a sufficient number of those jobs exist in the national economy to enable a successful transition. (Tr. 19–20.)

In determining Webster's RFC, the ALJ made three findings regarding the weight of the evidence that are relevant to this appeal. First, she gave "[l]ittle weight" to the opinions of Dr. Sullivan because "they did not appear to be based on the medical evidence in the file." (Tr. 18.) The ALJ concluded that the record supported neither the extreme restrictions that Dr. Sullivan placed on Webster's use of her hands nor his reference to Webster's right shoulder and lower back pain. (*Id.*) Second, the ALJ gave "overall partial weight" to the opinions of the consulting physicians because their proposed restrictions were "consistent with [Webster's] treatment for left shoulder, right knee pain, and her surgery on the left ring finger in combination with her obesity and asthma." (Tr. 17–18.) Finally, the ALJ found that Webster's testimony regarding her limitations was not "entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 19.) Among other things, the ALJ found that, although Webster testified that she needs help dressing and uses a cane to walk, Webster's left shoulder had improved to a normal range of motion and no medical provider had suggested that Webster would need a cane to ambulate. (Tr. 18.)

## II. Legal Standard

### A. Review of the ALJ's Decision

The Social Security Act authorizes the Court to review "any final decision of the Commissioner of Social Security made after a hearing" and "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (explaining that the Commissioner's post-hearing final decision with respect to SSI is "subject to judicial review as provided in section 405(g) of this title"). This Court reviews the final decision of the ALJ to determine whether it is supported by substantial evidence. *Miller v. Comm'r of Soc.*

22

*Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). When substantial evidence supports the ALJ's decision, that decision must stand even if the record could also support a contrary conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). However, the substantial evidence standard does not condone "a selective reading of the record" and instead requires the ALJ to have considered evidence that "'fairly detracts'" from her decision. *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

The Court also reviews the ALJ's decision for procedural fairness, determining whether the ALJ properly followed the law. *Miller*, 811 F.3d at 833. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Failure to follow agency rules and regulations, therefore, "'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Id.* (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). "The failure to comply with the agency's rules warrants a remand unless it is harmless error." *Gentry*, 741 F.3d at 723 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004)).

### B. Administrative Evaluation of Disability Claims

To receive DIB or SSI, Webster must establish that she has a "disability." 42 U.S.C. § 423(a), (d); 20 C.F.R. §§ 416.905(a), 416.920(a)(1), (2). In the DIB and SSI contexts, "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a). ALJs use a five-step analysis to resolve the question of disability:

> At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity; if the claimant is performing substantial gainful activity, then the claimant is not disabled. [20 C.F.R. § 404.1520(a)(4).] At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." *Id.* If the claimant does not have a severe impairment or combination of impairments, then the claimant is not disabled. *Id.* At step three, the ALJ must determine whether the claimant's impairment meets an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled. *Id.* Otherwise, the ALJ will proceed to the fourth step, where the ALJ must assess the claimant's residual functional capacity and past work. *Id.* If the claimant can still perform his or her past relevant work, the claimant is not disabled. *Id.* If the claimant cannot perform past relevant work, the ALJ must determine whether the claimant can make an adjustment to other work at step five. *Id.* If the claimant cannot make the adjustment, the ALJ will find the claimant disabled. *Id.*

*Miller*, 811 F.3d at 835 n.6; *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Webster bears the burden through step four, but, at step five, the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate [Webster's] residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). When determining the RFC, the ALJ must consider the combined effect of all the claimant's impairments in light of medical and nonmedical evidence. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir.

24

2014) (citing 20 C.F.R. § 404.1545(e)); 20 C.F.R. § 416.945(e). Under certain circumstances, the agency can carry its burden at step five by relying on the medical vocational guidelines, otherwise known as "the grid." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (explaining that the grid is designed to simplify decision-making by directing a finding of disabled or not disabled where certain common patterns of vocational factors are present); *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003) (noting that the grid only resolves the step-five analysis "where the characteristics of the claimant exactly match the characteristics in one of the rules"); 20 C.F.R. pt. 404, subpt. P, app. 2 (the medical vocational guidelines themselves). If the grid does not resolve the question of disability, the agency must rebut Webster's prima facie case with proof of Webster's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (explaining that a vocational expert will be able to analyze an individual's particular RFC to "determine the size of the remaining occupational base, cite specific jobs within the individual's [RFC], and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country" (quoting SSR 83–12, 1983 WL 31253, *4 (Jan. 1, 1983)).

Although the rules governing DIB and SSI define "disability" the same way, entitlement to one benefit does not necessarily entail entitlement to the other. Title II, which governs DIB, is an "'insurance program'" that provides, old-age, survivor, and disability benefits to insured individuals regardless of financial need. *Hale v. Comm'r of Soc. Sec.*, No. 1:09-CV-318, 2011 WL 5920914, at *1 (W.D. Mich. Oct. 25, 2011) (quoting *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988)). To be entitled to DIB, Webster must establish that she was disabled on or prior to her last insured date, which is "based on [her] earnings record." *Manson v. Comm'r of Soc. Sec.*, No. 12-11473,

25

2013 WL 3456960, at *2 n.1 (E.D. Mich. July 9, 2013) (citing 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130). Title XVI, on the other hand, governs SSI, and is a "'welfare program'" that provides benefits to "'financially needy individuals who are aged, blind, or disabled regardless of their insured status.'" *Hale*, 2011 WL 5920914, at *1 (quoting *Bowen*, 485 U.S. at 75); *see also Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984) (reversing district court whose denial of SSI cited claimant's lack of insured status). To be entitled to SSI, a claimant must show that she was disabled while her application was pending. *Frederick v. Berryhill*, 247 F. Supp. 3d 1014, 1017 (E.D. Mo. 2017) (citing 42 U.S.C. § 1382c and 20 C.F.R. §§ 416.330, 416.335).

## III. Analysis

Webster raises four issues on appeal. First, she asserts that the ALJ should have adopted Dr. Sullivan's statement of her limitations in determining her RFC and that the ALJ's failure to do so violated the treating physician rule. (Doc. No. 18-1, PageID# 1714–16.) Second, she argues that the ALJ inappropriately relied on the medical opinions of state agency physicians who never examined her and who did not have an opportunity to review the entire medical record. (*Id.* at PageID# 1713–14.) Third, Webster argues that the ALJ made various other errors in analyzing her RFC. (*Id.* at PageID# 1721–22.) Finally, Webster argues that the ALJ's decision to discount her credibility is not supported by the record. (*Id.* at PageID# 1717–21.) Webster's fourth argument is the only one with merit. Substantial evidence does not support the ALJ's analysis of Webster's description of her symptoms and the errors in that analysis are not harmless.

### A. Dr. Sullivan's December 22, 2015 Opinion

At the beginning of her analysis of Webster's RFC, the ALJ provided the following analysis of Dr. Sullivan's opinions:

> Little weight was given to the opinions of Dr. Sullivan at Exhibits 5F, 6F, and 12F, as they did not appear to be based on the medical evidence in the file. For example,

26

Dr. Sullivan opined the claimant could only use her right hand 50% of the time and left hand 0% of the time. However, the claimant testified to having no issues with her right hand and there is no objective medical evidence to support an inability to use the left hand at all. Additionally, he noted right shoulder pain; however, the claimant consistently complained of left shoulder pain rather than right (2F/4F/7F/9F). Dr. Sullivan noted chronic lower back pain but this was unsupported by treatment records. The claimant complained of neck pain and had small bulging cervical disc without stenosis but did not have pathology for lower back pain.

(Tr. 18.)

Although the ALJ referenced all of Dr. Sullivan's medical opinions, the only one at issue in this appeal is the December 22, 2015 RFC questionnaire that Dr. Sullivan completed. (Doc. No. 18-1, PageID# 1711–12.) Webster argues that the ALJ failed to provide good reasons for according his responses to that questionnaire little weight, citing records that show Webster suffered from right shoulder and lower back pain and explaining that Dr. Sullivan might have recommended limited use of Webster's right hand to prevent overexertion. (*Id.* at PageID# 1712–13.) The Commissioner disagrees, emphasizing that the limitations Dr. Sullivan prescribed for Webster's hands were not supported by the record and that Webster's right shoulder and lower back pain were peripheral issues. (Doc. No. 21, PageID# 1734–35.)

When the opinion of a treating physician[26] concerning the nature and severity of a claimant's condition or RFC is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

---

[26] A treating source is an "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The parties agree that Dr. Sullivan is a treating physician. (Doc. No. 18-1, PageID# 1707; Doc. No. 21, PageID# 1733.)

record," the ALJ must give that opinion controlling weight in her analysis.[27] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Gentry*, 741 F.3d at 727 (explaining that a treating physician's opinion concerning a claimant's RFC is also entitled to deference). The rationale behind this "treating physician rule," *Gentry*, 741 F.3d at 727, is that a treating source's opinion is most likely "to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ may only decline to adopt a treating physician's RFC if she provides "good reasons" for that decision. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Such reasons must be "supported by the evidence in the case record[] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

In determining how to weigh a treating physician's RFC that has been deemed non-controlling, the ALJ must consider the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the treating source, and any other relevant factors. *Gentry*, 741 F.3d at 727; 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling

---

[27]     On March 27, 2017, 20 C.F.R. § 404.1520c eliminated the treating physician rule. However, because that change only applies to claims failed on or after March 27, 2017, and because Webster filed her claims in September 2014, the treating physician rule and case law interpreting it control here. *See Bedinghaus v. Comm'r of Soc. Sec.*, No. 1:17-CV-862, 2018 WL 6321241, at *4 (S.D. Ohio Dec. 4, 2018).

28

weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017), *cert. granted*, 138 S. Ct. 2677 (2018).

Substantial evidence supports the ALJ's decision to question the limitations that Dr. Sullivan placed on Webster's use of her left hand. By the time Dr. Sullivan filled out the questionnaire in December 2015, Webster's left ring finger had healed significantly post-surgery. At her post-op appointment on August 24, 2015, Webster was encouraged to do home physical therapy exercises with the injured hand. An X-ray in September found that the fractured finger was healing in anatomic alignment. Although the pain in Webster's hand increased after the October 11, 2015 car accident, an October 14, 2015 X-ray showed that the finger had not been reinjured. Webster did report that pain was traveling from her shoulders into her fingers in November 2015 and she showed weakness in both her left arm and hand in June 2016. But it was not unreasonable for the ALJ to conclude that that "no objective medical evidence support[s] a complete inability to use the left hand at all." (Tr. 18.) Although Webster's testimony that she is unable to hold a cell phone with her left hand is consistent with Dr. Sullivan's ban on use of that hand, there is evidence in the record to support the ALJ's different conclusion. *See Remias v. Comm'r of Soc. Sec.*, 690 F. App'x 356, 357 (6th Cir. 2017) (concluding that substantial evidence supported the ALJ's decision to discount treating physician Cowan's opinion regarding the claimant's psychological limitations—which included in inability to work with the public— because the claimant's treatment records did not support limitations of such severity).

Substantial evidence also bolsters the ALJ's finding of a lack of support in the record for Dr. Sullivan's recommendation that Webster limit use of her right hand to four hours a day. Webster testified that she has no trouble using her right hand, and the only mention of right hand pain in the record is Webster's November 24, 2015 statement that she had bilateral shoulder pain

29

radiating into her fingertips. Webster concedes that her right hand is uninjured and argues that Dr. Sullivan's choice to limit its use was prophylactic: "[i]t is [] common for a physician to place limitations on a patient when that patient has severe difficulty with the other extremity as it will cause overuse of the non-injured extremity." (Doc. No. 18-1, PageID# 1712.) But Dr. Sullivan did not explain his limitation of Webster's use of her right hand, and there is no evidence in the record to support Webster's reading.

The record evidence also substantially supports the ALJ's observation that Webster "consistently complained of left shoulder pain rather than right." (Tr. 18.) That is not to say that Webster did not experience right shoulder pain at all. Dr. Reid-Lawrence noted that Webster had tendinitis in both shoulders in April 2014, and Webster reported bilateral shoulder pain in November 2015 and again during range of motion exercises in June and August 2016.[28] But those reports are vastly outnumbered by records pertaining to Webster's left shoulder pain. From December 2012 through August 2016, Webster's left shoulder was treated dozens of times. She had MRIs, steroidal injections, and two surgeries. There are no records of treatment associated with Webster's limited complaints of right shoulder pain. Given that asymmetry, the fact that Dr. Sullivan mentions "severe" right shoulder pain in the symptoms section of the questionnaire—but not left shoulder pain—is puzzling, and may, as the Commissioner suggests, have been an error. (Tr. 1071); (Doc. No. 21, PageID# 1735. In describing the "clinical findings and objective signs"

---

[28]     Webster also cites a March 17, 2014 record in which she complained of right shoulder pain. (Doc. No. 18-1, PageID# 1713.) The Commissioner rightly responds that Webster's complaint was related to drainage of an abscess near her shoulder and was therefore "unrelated to her long-term musculoskeletal condition." (Doc. No. 21, PageID# 1735.)

of Webster's pain, Dr. Sullivan made no mention of the right shoulder and instead wrote: "[w]eak grip, unable to elevate L shoulder above waist." [29] (Tr. 1071.)

Although Dr. Sullivan's reference to severe right shoulder pain detracts from the reliability of his opinion, the same is not true of his reference to Webster's lower back pain. The ALJ criticized Dr. Sullivan for noting chronic lower back pain because such pain "was unsupported by treatment records." (Tr. 18.) That finding is inaccurate. Webster fell in January 2014 and complained of chronic low back pain in a February 24, 2015 appointment with Dr. Reid-Lawrence. The consulting physicians' opinions from March 16, 2016, and April 1, 2015, also mention the fall and related back pain. (Tr. 86, 97.) Dr. Reid-Lawrence was troubled enough by the tenderness in Webster's lumbar spine that she ordered an X-ray and a refill of Webster's Lortab prescription. There is no record of the X-ray in the case file, but Webster complained of lower back pain in March 2015 and again in June and August 2016. Although it is true, as the ALJ emphasizes, that Webster also "complained of neck pain and had a small bulging cervical disc without stenosis," upper and lower back problems are not mutually exclusive. (Tr. 18.) The record supports Dr. Sullivan's reference to Webster's chronic lower back pain.

Overall, substantial evidence supports the reasons that the ALJ provided for giving Dr. Sullivan's opinion little weight. The limitations Dr. Sullivan prescribed for Webster's hands were extreme when considered in the context of the other substantial evidence in the record, and his

---

[29]     There are other reasons to question the reliability of Dr. Sullivan's questionnaire responses. In describing the length of his contact with Webster, Sullivan wrote "2y every 3 mo," (Tr. 1071), which is at odds with his September 3, 2015 medical source statement, in which he wrote that he had been treating Webster for three years (Tr. 1067). In response to the question regarding the nature and severity of Webster's pain, Dr. Sullivan mentioned that she was scheduled for neck surgery, but there is no evidence of such a surgery in the record; at the time Dr. Sullivan wrote that, Webster was in the process of rescheduling her second shoulder surgery, which had been cancelled after she fractured her finger. Finally, Dr. Sullivan appears to have filled out the same page twice. (Tr. 1072, 1073.)

31

reference to right rather than left shoulder pain appears to have been an error. Although the ALJ did not explicitly analyze each factor that is relevant to weighing a non-controlling treating physician's opinion, the Court finds that her reasoning shows that she adequately considered them. *See Biestek*, 880 F.3d at 785; *Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248 (6th Cir. 2016) (holding that the reasons the ALJ offered to treat the treating physician's opinion as non-controlling demonstrated that the ALJ applied the appropriate regulatory factors). The ALJ's juxtaposition of (1) Webster's September 2016 statement at the hearing that she had no trouble with her right hand with (2) Dr. Sullivan's December 2015 limitations on use of that hand, shows that the ALJ considered the length and extent of the treatment relationship—even if Dr. Sullivan's limitations were justified at the time he prescribed them, things had changed by September 2016 when Dr. Sullivan had stopped treating Webster. Further, the ALJ's analysis of Dr. Sullivan's findings with respect to Webster's hands and right shoulder shows that she considered the consistency of his opinion with the whole record. Substantial evidence supports the ALJ's weighing of Dr. Sullivan's opinion.

### B. The Consulting Physicians' Opinions

The ALJ provided the following analysis of the consulting physicians' opinions:

> Regarding the claimant's mental limits, the opinion of DDS consultants at Exhibit 2A was consistent with the claimant's allegations at the hearing where she stated she needed help with dressing herself and was unable to drive and with a Function Report at Exhibit 3E where she reported difficulty handling stress. The opinion of DDS consultants upon reconsideration was inconsistent with the aforementioned limits (7A). However, the physical limits opined by DDS were consistent with the claimant's treatment for left shoulder, right knee pain, and her surgery on the left ring finger in combination with her obesity and asthma (7F/8F/10F/17F/18F). Therefore, the opinion of DDS consultants was given overall partial weight (2A/7A).

(Tr. 17–18.)

32

Webster argues that the ALJ "relie[d] on State agency physicians that never saw or treated Ms. Webster" even though those physicians rendered opinions "on January 14, 2015 and April 2, 2015 [and therefore] did not receive an opportunity to assess and address Ms. Webster's entire treatment history." (Doc. No. 18-1, PageID# 1714.) The Commissioner responds that the ALJ "demonstrated a thorough knowledge of the entire record, and in the end only gave partial weight to these opinions." (Doc. No. 21, PageID# 1737.)

When a treating physician's opinion has been deemed non-controlling, the same factors used to weigh that opinion—the nature of the treatment relationship, specialization, consistency, and supportability—are relevant to determining the weight of any other medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). In general, a treating source will be given more weight than a source who has examined the claimant but not treated her regularly, and an examining source will be given more weight than a consulting source who has never examined the claimant. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). Put differently, "'[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Id.* (alteration in original) (quoting SSR 96–6p, 1996 WL 374180, at *2 (July 2, 1996)). That said, state agency medical consultants are "'highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act,'" *Miller*, 811 F.3d at 834 (alteration in original) (quoting SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)), and, therefore, in "'appropriate circumstances,'" a consulting physician's opinion may be entitled to greater weight than that of a treating or examining source. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).

33

The ALJ only relied on the consulting physicians' opinions in part. Although the ALJ found that the consulting physicians' proposed physical RFC was consistent with treatment of Webster's left shoulder, left finger, right knee, obesity, and asthma, the ALJ did not adopt that RFC outright and instead attempted to update it based on changes in Webster's medical condition. At the time of the consulting doctors' opinions, Webster had not yet broken her left finger and she had only undergone one left shoulder surgery. The consulting physicians opined that Webster could freely use her hands for manipulation of objects and that her ability to push and pull was unlimited. They also placed no restrictions on Webster's use of her left arm to bear weight. Writing in December 2016, the ALJ was less optimistic, finding that Webster could only use her left hand occasionally and that she could carry less than ten pounds with her left arm. She also concluded that Webster could only occasionally push and pull with her left arm. Nonetheless, the remaining physical limitations in the ALJ's RFC—sitting six of eight hours, standing/walking six of eight hours, occasional overhead reaching with the left arm, and avoiding respiratory irritants—are consistent with the consulting physicians' opinions.

Substantial evidence supports the ALJ's limited reliance on the consulting physicians' opinions. Because there is no overlap between the ALJ's RFC and Dr. Sullivan's, it appears that the consulting physicians' opinions outweighed Dr. Sullivan's in the ALJ's analysis. Such an outcome is acceptable, for instance, when a "'consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source.'" *Blakley*, 581 F.3d at 409 (quoting SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996)). As Webster points out, that is not the case here: the consulting physicians issued their opinions in early 2015 and therefore did not have a chance to review the remainder of the records from that year or any of the 2016 records. (Doc. No. 18-1,

PageID# 1714.) However, the ALJ's significant updates to the consulting physicians' RFC provide sufficient assurance that the ALJ considered the incompleteness of the consulting physicians' review of the record before according their opinions greater weight than that of Dr. Sullivan, and that is all that is required. *See Blakley*, 581 F.3d at 409; *see also Gibbens*, 659 F. App'x at 248 (finding that ALJ had subjected consulting physician's opinion to adequate scrutiny where ALJ's "own analysis clearly spanned the entire record"); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (concluding that that the ALJ's adoption of greater restrictions on claimant's activities of daily life than those adopted by consulting physician Balunas showed that, before according Balunas's opinion greater weight, the ALJ had considered that Balunas had not reviewed the entire record).

### C. Miscellaneous Arguments Pertaining to Webster's RFC

Webster also argues that the ALJ made several other errors in analyzing her RFC. First, Webster contends that the ALJ was wrong to conclude that Webster could do light work given the RFC condition that Webster cannot lift ten or more pounds with her left arm. (Doc. No. 18-1, PageID# 1722.) Second, Webster argues that the ALJ erred by finding that Webster could do light work and then concluding, at step five of the analysis, that Webster could do three sedentary jobs. (*Id.*) Finally, Webster argues that the ALJ was wrong to find that Webster could do sedentary work given the RFC condition that Webster can only occasionally handle/finger with her left hand. (*Id.*)

None of these arguments has merit. Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Although Webster is right that the ALJ found that Webster could only lift less than ten pounds with her left arm, Webster does not explain how that finding is inconsistent with the definition of light work. And given the ALJ's additional finding

that Webster could lift twenty pounds with the right arm, no such explanation is evident. With respect to the relationship between light work and sedentary work, the Commissioner is correct to point out that an ability to complete the former entails, in most circumstances, an ability to complete the latter. 20 C.F.R. §§ 404.1567(b), 416.967(b) (explaining that, "[i]f someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time"); (Doc. No. 21). Importantly, however, the ALJ found that Webster's limitations—as manifested in her RFC—did not enable her to complete the full range of light or sedentary work and relied on the VE to determine that Webster could do three unskilled, sedentary jobs. (Tr. 19–20.) Webster's suggestion that her ability to only occasionally use her left hand for handling and fingering is inconsistent with all forms of sedentary work does not find support in the rule she cites, which states that "[m]ost"—not all—"unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Webster offers no reason to believe that the unskilled, sedentary jobs that the VE identified are not exceptions to that general rule.

### D.    Webster's Symptoms

After citing the relevant regulations (Tr. 14), the ALJ concluded that, Webster's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [but Webster's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 19). In reaching that conclusion, the ALJ provided the following analysis:

> There were several inconsistencies between the objective medial evidence and the claimant's allegations and testimony. For example, the claimant testified that she needed help getting dressed. However, after her left shoulder arthroscopy, she reported improvement. In March 2016, she reported she was feeling much better

36

since the procedure and reported minimal pain in the left shoulder (18F). In July 2016, an MRI of the left shoulder showed no full thickness rotator cuff tear pathology (15F). In September 2016, her left shoulder and left wrist were both normal with a normal range of motion. She testified that she needed a cane for ambulation in her home. However, an MRI of the right knee had only mild findings and an examination showed a normal gait/ station with no effusion, significant swelling, and normal alignment. Although the claimant stated she needed a cane to walk, her physician noted otherwise and indicated the claimant did not need a cane or any assistive device to stand/ walk (6F). Additionally, there are no other medical providers who recommended that the claimant needed a cane or who suggested that the clamant was unable to ambulate without a cane/ assistive device. To the contrary, she was encouraged to exercise her knee as tolerated (15F). Despite the claimant's physical problems arising more recently, she has not worked since 2007. But in 2014, she reported that she was able to care for both her cousin and her daughter at the same time (16F).

In February 2016, she asked her physician to complete disability paperwork, and she requested clearance for bariatric surgery (8F/16F). Additionally, she underwent a psychological assessment as a referral for her bariatric surgery (13F). Prior to that, she was prescribed Buspar to take as needed. However, she reportedly stopped taking it on her own. Afterwards, she described decreased stress and improved mood. She stated she felt she could go without psychiatric medications and her caseworker noted she did not show much interest in psychotherapy (8F). The undersigned found the claimant's bariatric surgery to be compelling regarding the issue of her mental health. Specifically, it was noted that the claimant's mild anxiety and mild depressive symptoms were likely related to reduced energy and chronic obesity and that she displayed no psychotic features but did display antisocial personality features. She was found to meet criteria for an adjustment disorder, found capable of processing new information and making decisions, and noted to have no significant psychopathology. In mental health treatment records, the claimant was not able to describe her ADHD symptoms clearly, yet she continued to request Adderall and said that she did not want any medication other than Adderall (20F). The aforementioned evidence suggested the claimant's mental health symptoms were not as limiting as alleged.

(Tr. 18.)

Webster argues that the "overwhelming medical evidence demonstrates the credibility of [her] complaints of her daily loss of function due to [her] conditions" and, therefore, the ALJ's decision to discredit her testimony is not supported by substantial evidence. (Doc. No. 18-1, PageID# 1720–21.) The Commissioner responds that the ALJ properly concluded "that the objective medical evidence, improvement with treatment, the treatment record, [Webster's]

activities, and the medical advice were inconsistent with her allegations." (Doc. No. 21, PageID# 1740.)

On March 16, 2016, the Social Security Administration rescinded prior rule SSR 96-7p and replaced it with SSR 16-3P to "clarify that subjective symptom evaluation is not an examination of an individual's character" and, therefore, such an evaluation should not refer to the individual's credibility. SSR 16-3P, 2016 WL 1119029, at *1 (Mar. 16, 2016). Webster's reference (Doc. No. 18-1, PageID# 1717–18) to the ALJ's failure to analyze her "credibility" and related citation of SSR 96-7p is therefore misplaced—the ALJ issued her opinion in December 2016, after 96-7p was no longer in effect. Nonetheless, the procedures under the new and old rule are "substantially the same," and case law interpreting the prior rule is still relevant. *Banks v. Comm'r of Soc. Sec.*, No. 2:18-CV-38, 2018 WL 6060449, at *5 (S.D. Ohio Nov. 20, 2018) (explaining that, "according to the very language of SSR 16-3[P], its purpose is to 'clarify' the rules concerning subjective symptom evaluation and not to substantially *change* them") (emphasis in original) (internal quotations omitted).

In determining whether an individual is disabled, an ALJ must "consider the individual's symptoms"—namely, the individual's own description of his or her impairments—and "the extent to which those symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3P, 2016 WL 1119029, at *2 (Mar. 16, 2016); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a). To do that, the ALJ must first decide whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce [the] individual's symptoms." SSR 16-3P, 2016 WL 1119029, at *2 (Mar. 16, 2016). If that is the case, the ALJ must analyze the "intensity and persistence of those symptoms

to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id.* Factors relevant to that analysis include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7.

An ALJ's findings with respect to the degree of consistency between an individual's symptoms and the evidence in the record receive "special deference." *Biestek*, 880 F.3d at 788 (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "As long as the ALJ cited substantial, legitimate evidence to support [her] factual conclusions [the Court is] not to second-guess . . . ." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).

The ALJ's analysis of Webster's symptoms suffers from multiple misstatements of the record that call into question not only her weighing of Webster's testimony, but the RFC that she ultimately adopted. The ALJ significantly overstated the recovery of Webster's left shoulder and her right knee, downplayed her diagnosis with diabetes, and wrongly hailed the time that Webster hosted her cousin and cousin's daughter as proof of Webster's employability. The reasons that the

39

ALJ provided to doubt Webster's psychological symptoms are not enough to make up for those deficiencies.

## 1.     Webster's Left Shoulder

The ALJ concluded that Webster's claim that she needed help getting dressed was inconsistent with the extent to which she had healed after the March 15, 2016 surgery.[30] It is true that Webster reported minimal pain on March 30, 2016, and that a July 8, 2016 MRI of the shoulder showed no full thickness rotator cuff tear pathology. But the ALJ omitted that the same MRI showed mild tendinitis and blunting of the anterior labrum due to either previous debridement or chronic degeneration. And Webster's reports of improvement had ceased by June, at which point she was again complaining of left shoulder pain. The last substantive record with respect to Webster's left shoulder is from a July 29, 2016 appointment with Dr. Haslam in which he noted that Webster rated her pain a nine out of ten, that overhead motion aggravated the shoulder, and that injections and physical therapy had not provided any significant relief. The ALJ's claim that, by September 2016, Webster's "left shoulder and left wrist were both normal with a normal range of motion" finds no support in the record. (Tr. 18.) The Commissioner concedes that no such record exists, assuming that the ALJ meant to refer to an August 11, 2016 record in which Webster was noted as having a normal range of motion in her left elbow and wrist. (Tr. 1648); (Doc. No. 21, PageID# 1734–35). The ALJ's misreading of the record enabled her to characterize Webster's

---

[30]     Webster argues that her "reports of loss of function of her left upper extremity and neck are consistent with the results of the multiple MRIs, physical examinations, three (3) left upper extremity surgeries within less than a two (2) year time period." (Doc. No. 18-1, PageID# 1719.) The record, and Webster's summary of it, shows only two shoulder surgeries and therefore Webster's reference to a third such surgery appears to have been an error. (*Id.* at PageID# 1707–10.)

40

post-surgery trajectory as one of successful recovery when, in fact, it mirrored the earlier trend of temporary improvement and then decline.

### 2. Webster's Right Knee

The ALJ questioned Webster's claim that she needed a cane to walk in her home by mischaracterizing the record. The ALJ rightly points out that Dr. Sullivan, in his December 22, 2015 questionnaire responses, stated that Webster did not need a cane or other assistive device to walk. (Tr. 1074.) But the ALJ overlooked the fact that Webster was not given a cane until March 7, 2016, which was several months after Dr. Sullivan completed the questionnaire. Despite the ALJ's claim that "no other medical providers . . . recommended that [Webster] needed a cane," Webster received the cane from Dr. Bowman. (Tr. 18.) Further, although Webster was noted as having a normal gait in examinations on July 14, 2016, and July 29, 2016, notes from June 6, 2016 and August 11, 2016 examinations reflect that Webster used a cane and walked with a slowed gait. Nurse Practitioner Johnson's July 14, 2016 notes do state that Webster was encouraged to exercise as tolerated, but that recommendation is absent from Webster's July 29, 2016 follow-up appointment with Dr. Haslam, which instead mentions that bearing weight aggravates Webster's discomfort. Even if exercise had been persistently prescribed, the ALJ does not explain how such exercise is inconsistent with Webster's use of a cane. The same is true of the MRI findings that the ALJ classifies as mild—the ALJ does not clarify how a diagnosis of chondromalacia, which is what the MRI confirmed, is at odds with Webster's reliance on a cane. (*Id.*)

### 3. Webster's Work History and Ability as a Caretaker

The ALJ states that, "[d]espite [Webster's] physical problems arising more recently, she has not worked since 2007." (*Id.*) Although the relevance of this statement is not entirely clear, the implication seems to be that, because Webster was able to work before her "physical problems"

arose, but chose not to do so, there is reason to question her claim that she is currently unable to work. (*Id.*) This reasoning, which seems more focused on Webster's propensity to tell the truth over time than with the extent to which her symptoms are consistent with the evidence in the record, smacks of the credibility analysis that the Social Security Administration has instructed ALJs to abandon. *See* SSR 16-3P, 2016 WL 1119029, at *1 (Mar. 16, 2016). Even if that were not the case, the ALJ's claim that Webster's "physical problems" are a recent development unfairly ignores Webster's 2002 hospitalization and diagnosis with diabetes, which, Webster testified, preceded the end of her full-time employment.

The ALJ also claims that Webster "reported that she was able to care for both her cousin and her daughter at the same time" and implies that such caretaking is further evidence of Webster's ability to work. (Tr. 18.) Dr. Kenneth Osiezhaga's notes from an October 13, 2014 appointment with Webster do state that Webster claimed that "she [was then] caring for two bays at the same time ([h]er 17 [year-old] cousin and her [cousin's] daughter)." (Tr. 937, 1490.) Yet the notes offer no description of what "caring" for Webster's cousin and her infant entailed, and the ALJ does not explain how whatever it might have entailed demonstrates Webster's ability to hold a job. Further, the ALJ neglects to mention that, in the same October 13, 2014 appointment, Webster stated that the presence of her cousin and her cousin's infant was "one of [Webster's] major stressors." (Tr. 1490.) Follow-up sessions on December 8, 2014, and January 26, 2015 confirmed that Webster's cousin was exacerbating the anxiety for which Webster was seeking treatment. (Tr. 1117, 1120.) By February 23, 2015, Webster had "put her cousin out" because "she was not able to deal with her" and Webster's anxiety had significantly improved. (Tr. 1113.) Thus, rather than demonstrating Webster's ability to work as a caretaker, or in some other capacity,

42

Webster's brief stint hosting her cousin and her cousin's infant merely complicated her underlying psychological problems.

### 4. Webster's Mental Health Symptoms

The ALJ's analysis of Webster's mental health symptoms suffers from fewer defects than does her analysis of Webster's physical symptoms. The ALJ properly noted that Webster's psychological screening for bariatric surgery was optimistic about Webster's mental health. Although Webster's evaluator noted that Webster had adjustment disorder with mild anxiety and depression, the evaluator viewed those issues as connected to Webster's obesity, and therefore subject to mitigation through the bariatric procedure. (Tr. 1431–32.) The ALJ also rightly pointed out that, on September 1, 2016, Webster insisted that she needed only Adderall for her depression, even after being told that Adderall is not prescribed for depression. (Tr. 1657.) However, the ALJ's criticism of Webster for ceasing to take Buspar, which she had been prescribed for anxiety, is misplaced. (Tr. 18.) Webster had stopped taking the drug because it made her "mean" and she did not like it (Tr. 1113), and the Social Security Administration has made clear that an "individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." SSR 16-3P, 2016 WL 1119029, at *9 (Mar. 16, 2016); *see also Biestek*, 880 F.3d at 789 (explaining that "adverse side effects are a reasonable excuse for an applicant to interrupt a prescribed treatment regimen"). Further, although Webster expressed an interest on February 23, 2015, in experimenting with going off her medication, the ALJ ignores the fact that she was back on it by October 2015. (Tr. 1106–07, 1113.) The ALJ also incorrectly claims that Webster was uninterested in psychotherapy. (Tr. 18.) In a February 23, 2015 appointment, Webster showed "much interest" in psychotherapy, and appointment notes reflect that she began and continued such therapy over the course of the next year. (Tr. 1101, 1104, 1107.)

43

5.    **Harmless Error**

The ALJ repeatedly misstated the severity of Webster's physical symptoms in a way that is not "consistent with and supported by the evidence . . . ." SSR 16-3P, 2016 WL 1119029, at *9 (Mar. 16, 2016). The ALJ's analysis of Webster's psychological symptoms is less error-riddled, but it is also less relevant to this appeal, which turns on Webster's physical symptoms: Webster has not challenged the ALJ's RFC as it pertains to Webster's mental abilities and has instead suggested that Dr. Sullivan's December 22, 2015 physical RFC questionnaire should have been adopted. (Doc. No. 18-1, PageID# 1711-17.)

Although the ALJ's analysis of Webster's symptoms is not supported by substantial evidence, her decision must be upheld if the error was harmless. *See Ulman*, 693 F.3d at 714 (holding that "harmless error analysis applies to credibility determinations in the social security disability context"). An error is harmless if, when it is set aside, there remains substantial evidence to support the ALJ's decision. *Id.*; *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013).

With respect to Webster's application for SSI, the ALJ's errors is not harmless. This is not a case in which one isolated error is dwarfed by an otherwise substantially supported analysis of the claimant's symptoms. *Cf. Meuzelaar v. Comm'r of Soc. Sec.*, 648 F. App'x 582, 585 (6th Cir. 2016) (holding that any error in the ALJ's failure to mention that claimant's lack of insurance was driving her relatively conservative treatment plan was harmless because the other problems with the claimant's testimony that the ALJ mentioned "amply support[ed] the ALJ's credibility finding"). Every reason that the ALJ offered to question Webster's symptoms either misstated the record or failed to provide necessary context. Most concerning is the ALJ's reference to a non-existent September 2016 record allegedly showing that Webster had a normal range of motion in

44

her shoulder. Not only does that record not exist, but the most recent records associated with Webster's shoulder showed significant decline. Given that the VE testified that Webster would not be able to do the jobs he had identified in the first hypothetical (which contained the RFC that the ALJ ultimately adopted) if Webster "could never push or pull with the left, non-dominant upper extremity," the Court cannot confidently conclude that the ALJ's ruling on the ultimate question of disability would stand had she properly analyzed Webster's symptoms and the record as a whole. (Tr. 59.) Webster's application for SSI therefore requires further administrative consideration.

Webster's application for DIB requires a different result. Although neither the parties nor the ALJ address this issue, there is no evidence in the record that would support a finding of disability prior to Webster's last insured date of December 31, 2008. To receive DIB, Webster must prove that she was disabled on or before her last insured date. The only records provided from before December 31, 2008, are those pertaining to Webster's February 22, 2005 visit to the emergency department due to abdominal pain; that incident predates the alleged onset of Webster's disability. (Tr. 1351–58.) The absence of evidence in the record for the relevant period was the basis for the denial of Webster's DIB application at the initial level and on reconsideration. (Tr. 65–66, 98–99.) That fact has not changed, and further reconsideration of Webster's symptoms and RFC on remand would not affect Webster's lack of entitlement to DIB. The ALJ's errors in assessing Webster's symptoms do not affect that analysis. *See Day v. Comm'r of Soc. Sec.*, No. 16-12913, 2017 WL 4960178, at *4 (E.D. Mich. Sept. 28, 2017) (holding that "the ALJ could not have found that Plaintiff's impairments met or medically equaled Listing 4.05 at any time prior to her last insured date," and therefore that "the ALJ's deficient analysis of this question was harmless error"); *see also Weiss v. Comm'r of Soc. Sec.*, No. 1:09-CV-1019, 2011 WL 754954, at *7 (W.D.

45

Mich. Feb. 1, 2011) (explaining that any error in ALJ's analysis of claimant's testimony was harmless where the testimony "involved her condition years after her last insured date" and therefore did not "reflect her condition during the relevant time period").

## IV. Conclusion

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Webster's motion for judgment on the administrative record (Doc. No. 18) be GRANTED IN PART, in that the decision of the Commissioner as it pertains to Webster's application for DIB be AFFIRMED and the decision as it pertains to Webster's application for SSI be REVERSED, and that the case be REMANDED for further administrative proceedings consistent with this report.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 19th day of February, 2019.

.

ALISTAIR E. NEWBERN
United States Magistrate Judge